IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERICAN TOOLING CENTER, INC.,
a Michigan corporation,

      Plaintiff,

vs.                                                                  Case No.:

TRAVELERS CASUALTY AND                             Hon.:
SURETY COMPANY OF AMERICA,
a Connecticut domiciled insurance company,

      Defendant.
_____

There are no pending or previously discontinued or dismissed companion cases in this or any other court, including state court.
_____

## **PRELIMINARY STATEMENT**

1.    This action is for breach of contract and declaratory relief arising out of Traveler Casualty and Surety Company of America's unjustified refusal to provide insurance coverage under a Crime insurance policy providing insurance coverage to American Tooling Center, Inc. ("ATC").

2.    ATC is a Named Insured under Travelers Casualty and Surety Company of America ("Travelers") "Wrap +" insurance policy, Policy No. 024-LB-105493837 for the Policy Period of October 1, 2014 to October 1, 2015

(the "Policy"), which specifically provides Crime coverage for losses resulting from "Computer Fraud."

3. The Policy was issued to ATC's affiliated company Superior CAM, Inc., ("Superior CAM") at its business address of 31240 Stephenson Highway, Madison Heights, Michigan.

4. ATC was the victim of crime and computer fraud in which certain employees in ATC's finance department were deceived by fraudulent emails from perpetrators forged to appear as if they were coming from a legitimate ATC vendor Shanghai YiFeng Automotive Die Manufacture Co., Ltd. ("YiFeng"), resulting in the wire transfer of $834,107.76 to an overseas account thought to be the account of YiFeng.

5. Superior CAM, and its affiliated companies such as ATC, purchased the Policy, and the Policy is designed to protect ATC against precisely the type of loss it has now incurred as a result of the computer fraud. Yet despite the fact that Superior CAM paid its premiums, gave prompt notice of this computer fraud to Travelers, and cooperated fully and completely with Travelers' inquiry into the fraud, Travelers has failed and refused to pay ATC's claim of $829,107.76 ($834,107.76 minus the $5,000.00 deductible) for its losses (the "Claim") under the Policy. Travelers'

refusal to pay constitutes a breach of the Policy and its contractual obligations.

6. ATC also seeks a declaration that the Policy provides coverage for the Claim.

## THE PARTIES

7. Plaintiff ATC incorporates herein by reference paragraphs 1-6 as if each is set forth fully herein.

8. Plaintiff ATC is a Michigan corporation with its principal place of business in Grass Lake, Michigan.

9. Upon information and belief, Defendant Travelers is an insurance company organized and domiciled under the law of the State of Connecticut with its principal place of business in Hartford, Connecticut.

10. Upon information and belief, Travelers is authorized to sell or write property and casualty insurance in Michigan and, at all material times, has conducted and continues to conduct substantial insurance business in the State of Michigan, including engaging in the business of selling insurance, investigating claims, and/or issuing policies that cover policyholders or activities located in Michigan.

## JURISDICTION AND VENUE

11. Plaintiff ATC incorporates herein by reference paragraphs 1-10 as if each is set forth fully herein.

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties to this action and because the amount in controversy exceeds $75,000, exclusive of interests and costs.

13. Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

14. Plaintiff ATC incorporates herein by reference paragraphs 1-13 as if each is set forth fully herein.

### A.     The Travelers' Policy

15. In consideration of significant premiums paid to cover exactly the type of loss at issue here, Travelers sold the Policy to Superior CAM for the policy period of October 1, 2014 to October 1, 2015. This Policy is attached as **Exhibit A**.

16. The Policy was issued to Superior CAM at its principal place of business in Madison Heights, Michigan.

17. The Declarations page of the Policy provides a Single Loss Limit of $1,000,000.00 and a $5,000.00 deductible for Computer Fraud.

18. Section I. Insuring Agreements, F. Computer Crime, 1. Computer Fraud, of the Policy provides:

> **1. Computer Fraud**
>
> The Company will pay the **Insured** for the **Insured's** direct loss of, or direct loss from damage to, **Money**, **Securities** and **Other Property** directly caused by **Computer Fraud**.
>
> [Emphasis added].

19. "**Computer Fraud**" is defined at III. Definitions, E., in the Policy as:

> "The use of any computer to fraudulently cause a transfer of **Money**, **Securities** or **Other Property** from inside the **Premises** or **Financial Institution Premises**:
>
> 1. to a person (other than a **Messenger**) outside the **Premises** or **Financial Institution Premises**; or
>
> 2. to a place outside the **Premises** or **Financial Institution Premises**.
>
> [Emphasis added].

20. "**Money**" is defined at III. Definitions, II., in the Policy as:

> ". . . a medium of exchange in current use and authorized or adopted by a domestic or foreign government, including currency, coins, bank notes, bullion, travelers' checks, registered checks and money orders held for sale to the public.
>
> [Emphasis added].

21. "**Premises**" is defined at III. Definitions, MM., in the Policy as:

". . . <u>the interior of that portion of any building the Insured occupies in conducting the Insured's business</u>."

[Emphasis added].

B. **ATC Suffered a Direct Loss of $834,107.75 as a Result of Computer Fraud**

22. ATC is a manufacturer of production stamping dies for the automotive industry with a manufacturing facility located in Grass Lake, Michigan.

23. Since 2007, ATC has outsourced the manufacturing of some portions of production dies to YiFeng in Shanghai, China.

24. Generally, ATC issues purchase orders to YiFeng for manufacturing of portions of stamping dies.

25. YiFeng then issues invoices to ATC for the completed work, and ATC initiates wire transfers of U.S. funds through ATC's bank to a YiFeng bank account at the Industrial and Commercial Bank of China.

26. The ATC Vice President and Treasurer ("VP/Treasurer") is responsible for initiating wire transfers to YiFeng.

27. There have been various personnel changes at YiFeng since 2007, but the ATC VP/Treasurer has always had a specific YiFeng contact

in Shanghai with whom he communicated about various business issues, including receiving invoices, wire transfers, and payment confirmations.

28. Over the course of their business relationship, most wire transfers to YiFeng were made to the same beneficiary name and bank account number.

29. At times, YiFeng has requested that the beneficiary name and bank account number be changed.

30. These changes were always initiated via email from the YiFeng contact to the ATC VP/Treasurer, and no issues ever arose as a result of the requested changes—funds were always successfully wired and received by YiFeng.

31. Prior to July 2014, the ATC VP/Treasurer's contact at YiFeng was Ms. Kuku.

32. In July 2014, Ms. Kuku was replaced by Jessie Chen ("Ms. Chen").

33. From July 2014 to February 2015, there were no issues with any communications or wire transfers involving Ms. Chen or YiFeng.

34. This insurance coverage dispute relates to loss of money arising from a computer fraud where a third-party gained access to ATC's and/or YiFeng's electronic accounts, intercepted certain email traffic between ATC

and YiFeng, and through fraudulent emails generated by the third-party on their computer, directly caused wire transfers to occur from ATC to a bank account opened by the third-party hackers ("Hackers") to facilitate this computer fraud.

### C. Discovery of Loss

35. On March 18, 2015, the ATC VP/Treasurer sent an email to Ms. Chen at YiFeng requesting copies of all outstanding YiFeng invoices for ATC.

36. Unbeknownst to ATC and the ATC VP/Treasurer, the email accounts of ATC and/or YiFeng had been accessed by Hackers, resulting in the ATC VP/Treasurer's March 18, 2015 email being intercepted by the Hackers.

37. The Hackers were thereafter able to communicate separately with ATC VP/Treasurer and Ms. Chen via email.

38. On March 19, 2015, the Hackers, through emails generated on the Hackers' computers, replied to the ATC VP/Treasurer's March 18, 2015 email using a fraudulently doctored email address, appearing to be from YiFeng, which attached fraudulent invoices.

39. A series of emails followed, with the ATC VP/Treasurer being sent email that appeared to be from YiFeng, but that were actually from the Hackers using deceivingly incorrect email addresses for Ms. Chen.

40. The Hackers were able to replace certain letters in both Ms. Chen's and ATC VP/Treasurer's email addresses in a way that would deceive an unsuspecting person into believing the email address was correct. For example, the Hacker(s) replaced an "m" with a "rn" and/or a "rm" in Ms. Chen's email. In addition to Ms. Chen's email address being compromised, several other ATC and YiFeng email addresses were also compromised.

41. Having fraudulently accessed the email accounts, the Hackers instructed ATC, through a series of computer email exchanges dating from March 23, 2015 to May 20, 2015 (the "Fraudulent Emails"), to issue payments via wire transfer to various accounts and beneficiaries.

42. Pursuant to the instructions provided in the Fraudulent Emails, the ATC VP/Treasurer provided wire transfer instructions to ATC's bank directing it to initiate the following transfers (collectively, the "Fraudulent Wire Transfers"):

9

| Date | Wire Transfer Amount |
|---|---|
| 4/8/2015 | $349,892.35 |
| 4/9/2015 | $   1,575.00 |
| 5/8/2015 | $482,640.41 |
| TOTAL | $834,107.76 |

43. All of the Fraudulent Wire Transfers cleared to the benefit of the Hackers and the fraudulently-obtained funds were subsequently transferred by the Hackers to other accounts in China and elsewhere.

44. ATC did not purchase from the Hackers nor did it receive any goods or services from the Hackers in exchange for the Fraudulent Wire Transfers.

45. On May 21, 2015, following an email from Mr. Lai at YiFeng to the ATC VP/Treasurer, it became apparent to Mr. Lai that something was amiss. This prompted Mr. Lai to reach out via telephone to the ATC Engineering Manager, at which point ATC first discovered the loss.

46. During this phone call, Mr. Lai and the ATC Engineering Manager confirmed that ATC was a victim of computer fraud and Mr. Lai agreed to assist ATC with the criminal investigation.

47. Following the call, all email communications between the ATC VP/Treasurer and Ms. Chen (real and fraudulent) were discontinued and all future communications were made via telephone or personal email.

48. Over the next few days, ATC's Information and Technology Department launched an internal investigation of the Fraudulent Emails and Fraudulent Wire Transfers. During the course of its investigation it was discovered that:

> A. There were a total of three (3) wire transfers totaling $834,107.76 made to fraudulent accounts per instructions received in the Fraudulent Emails; and
>
> B. The Fraudulent Emails received from person(s) purporting to be Ms. Chen, Mr. Lai and the ATC Engineering Manager originated from computers with IP addresses located in South Africa and Russia.

49. In addition to conducting an internal investigation, ATC contacted its attorneys, who in turn contacted the Federal Bureau of Investigation (FBI).

50. ATC's bank was also contacted by ATC and an unsuccessful attempt was made to retract the Fraudulent Wire Transfers.

**D.    Travelers Denied ATC's Computer Fraud Claim Under The Policy**

51. Based on this criminal activity and computer fraud, ATC suffered a monetary loss of $834,107.76.

52. On May 22, 2015, a Notice of Loss was filed under Travelers Policy No.: 024-LB-105493837 by ATC through its insurance agency.

53. ATC cooperated fully with Travelers in its investigation of ATC's claim.

11

54. On July 8, 2015, Travelers denied coverage for ATC's loss. (**Exhibit B**).

55. Travelers has wrongly claimed that "the loss was not caused directly by the use of a computer to fraudulently cause a transfer of Money from inside the Premises or Banking Premises" because the Hackers induced ATC to input the fraudulent payment invoices into the ATC computers to initiate the transaction. (*Id*.)

56. On September 16, 2015, ATC's counsel responded to Travelers denial with a coverage analysis and a detailed Proof of Loss.

57. On October 2, 2015, Travelers affirmed its declination via reply correspondence.

## COUNT I: BREACH OF CONTRACT

58. Plaintiff incorporates herein by reference paragraphs 1-57 as if each is set forth fully herein.

59. The Policy is a valid and binding contract between ATC and Travelers, and Travelers has wrongly asserted that the Policy does not cover ATC's computer fraud loss as that coverage is defined in the Policy.

60. The terms of the Policy provide that Travelers "will pay the **Insured** for the **Insured's** direct loss of . . . **Money** . . . directly caused by **Computer Fraud**."

61. The loss suffered by ATC resulted directly from an off-premises computer sending emails to a computer on ATC's premises to fraudulently cause ATC to transfer its funds to a fraudulent premises.

62. ATC transferred money to the fraudulent bank accounts as a direct result of the fraudulent emails received by ATC purporting to be from their vendor YiFeng.

63. ATC would not have transferred the funds to the fraudulent bank accounts in the absence of the fraudulent computer emails, and the purpose of the emails was to cause ATC to transfer funds to the fraudulent accounts.

64. Alternatively, to the extent that any of the terms, conditions or exclusions of the Policy are ambiguous, these terms, conditions and exclusions must be construed in favor of the insured, ATC.

65. ATC has fully performed its obligations under the Policy, including all conditions precedent.

66. Travelers breached the Policy by refusing to indemnify ATC for this loss.

67. As a result of Travelers' breach of the Policy, ATC suffered damages in the amount of $829,107.76 ($834,107.76 minus the $5,000.00 deductible).

## **COUNT II: DECLARATORY RELIEF**

68. Plaintiff incorporates herein by reference paragraphs 1-67 as if each is set forth fully herein.

69. Pursuant to the terms of the Policy, Travelers is obligated to pay ATC, up to the $1,000,000 limit of liability, for the direct loss of "Money" that is caused by "Computer Fraud".

70. As detailed above, the facts of the Claim come within the Computer Fraud provisions of the Policy and its other terms and conditions.

71. There are no exclusions in the Policy that bar coverage for this Claim.

72. Travelers disputes that it has a legal obligation to pay the Claim.

73. Pursuant to 28 U.S.C. § 2201, ATC is entitled to a declaration by the Court of Travelers' obligations under the Policy.

74. An actionable and justiciable controversy exists between ATC and Travelers concerning the proper construction of the Policy, and the rights and obligations of the parties thereto, with respect to the Claim for the Fraudulent Wire Transfers.

75. ATC is entitled to a declaration that there is coverage available to it for the Fraudulent Wire Transfers under the Policy, and, pursuant to 28 U.S.C. § 2202, any other relief this Court deems proper.

## COUNT III: STATUTORY BAD FAITH, MCL 500.2006

76. Plaintiff incorporates herein by reference paragraphs 1-75 as if each is set forth fully herein.

77. By reason of conduct of Travelers in wrongfully failing to timely pay this Claim that is not reasonably in dispute, ATC has suffered an additional loss.

78. Travelers by failing to comply with MCL 500.2006 is obligated to pay ATC twelve percent (12%) per annum interest on the amount of ATC's Claim commencing sixty (60) days after the filing of the Proof of Loss on September 16, 2015, and continuing to accrue until paid.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, American Tooling Center, Inc., prays for relief as follows:

(a) Plaintiff requests that the Court enter judgment against Travelers, awarding Plaintiff damages in the amount of $829,107.76, plus all consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law;

(b) Plaintiff requests that this Court find Defendant has failed to comply with MCL 500.2006, and award ATC twelve percent (12%) per

annum interest on the amount of ATC's Claim of $829,107.76 from September 16, 2015, and continuing to accrue until paid;

      (c)    Plaintiff requests that this Court enter a Declaratory Judgment in favor of ATC against Travelers which declares that Travelers is obligated to pay ATC, up to the applicable limits of the Policy, for the Claim; and

      (d)    Plaintiff requests its attorney's fees and costs and any such other relief that this Honorable Court deems equitable, just or proper.

      Respectfully submitted,

      WILSON YOUNG PLC

      */s/ Douglas Young*
      DOUGLAS YOUNG
      Attorneys for Plaintiff
      Two Towne Square, Suite 901
      Southfield, MI  48076
      (313) 983-1235

Dated:  June 9, 2016      P43808